## Ball Creek Coal Co. et al. v. Napier.

Feb. 14, 1947.

As Modified on Denial of Rehearing
June 20, 1947.

S. M. Ward, Judge.

T. E. Moore, Jr., and L. E. Harvie for appellants.

Napier & Napier for appellee.

Opinion of the Court by Stanley, Commissioner—Reversing.

The question is the location of a boundary line described in a deed. The competency of parol evidence as to where it was intended to be is also in issue.

Two small creeks, Big Fork and Twin Fork (also called Pleasant Fork), meet to form Lick Branch of Ball Fork of Troublesome Creek, in Perry County. Big Fork flows almost due west. Twin or Pleasant Fork flows almost due south, and joins the other at right angles. The combined stream continues westwardly and is known as Lick Branch. M. S. Napier owned land on both sides of both creeks. On October 23, 1903, he conveyed to J. J. C. Mayo 320 acres on the east side of Twin or Pleasant Fork and the north side of Big Fork, the location being described as on Lick Branch. The deed calls for many courses and distances.

On December 20, 1903, Mayo conveyed this tract, with others, to one Pardee. The description is the same. On March 4, 1943, Pardee's estate executed a coal lease, or the equivalent, to one Degen, who formed the appellant coal company and transferred the lease to it. In the belief that the property was bordered on the south by Big Fork of Lick Branch, the company erected some of its mining structures and a roadway close to the bank of the stream.

After M. S. Napier died intestate, sometime after his conveyance to Mayo, his son, C. W. Napier, received deeds from his brothers and sisters of their undivided

interests in his real estate, "said land being on Lick Branch of Ball Fork of Troublesome Creek, in Perry County." Some of the deeds merely conveyed all the grantors' interest in their father's entire estate. On November 13, 1911, C. W. Napier made a deed to his brother, P. C. Napier, of land south of the creek, his deed calling for the meanders of Lick Branch as the northern boundary. P. C. Napier made a deed, with the same description, back to C. W. Napier and his wife, Addie Napier, the appellee herein. They mortgaged the land to a bank on November 10, 1920, with similar boundary lines. Eventually it was conveyed by the Master Commissioner of the Court to K. N. Salyers. Thus, it is established that the north boundary of the tract south of the property involved extended to the meanders of the creek. We are concerned with the location of the south boundary of the tract north of the creek. The question is whether the property now owned by the appellant coal company also follows the meanders of the creek, or whether there was an irregular strip left between it and the creek, which is now claimed by the appellees.

The appellee, Addie C. Napier, received a conveyance from her husband, C. W. Napier, one of the sons of the original owner, M. S. Napier, dated December 2, 1919 (which was not placed of record until August 21, 1943), of a strip of land varying in width from 10 or 15 feet to 150 feet at one point. The lines are given as being the south line of the Napier-to-Mayo deed and the meanders of Big Fork of Lick Branch. The north line (the south line in appellant's deed) runs through some of the mining structures, and the claimed strip of land quite effectually shuts off the mining operations from ingress and egress from and to the highway over which the company's coal must be hauled to a railroad. The production has been about 400 tons a day.

This action for trespass was brought by Addie C. Napier, who prayed for an injunction and damages. The court granted her the relief prayed for by locating the division line as she contended, and permanently enjoining the defendant from trespassing upon the strip of land. The matter of damages was not mentioned in the judgment.

The beginning and ending lines in the deed from Napier to Mayo and subsequent conveyances to the coal company are thus given in the deed from Napier to Mayo: "Beginning at a stake at the mouth of Twin Lick Fork of said Lick Branch; thence running up the big fork of said Lick Branch S 68½ E 15-6/10 poles S 47 E 12 poles N 73-¾ E 12 poles; S 63 E 10-5/10 poles, S 71-¾ E 17-2/10 poles, N 54½ E 12 poles; S 84½ E 8-8/10 poles S 28¼ E 8 poles to a stake 12 feet left of a buckeye N 60¼ E 18-6/10 poles N 80¼ E 13-3/10 poles S 24¼ E 9-2/10 poles to a rock N 89½ E 15-8/10 poles N 44 E 8 poles N 84 E 22-6/10 poles to a stake 8 feet to a spruce pine; thence S 88 E 12-4/10 poles to a stake 4 feet left of a spruce pine on a cliff on the south side of the branch and corner to the lands of Mahala Fugate; thence running up the hill with the line of Mahala Fugate; * * * thence down the hill N 66½ W 38 poles to three forked spruce pines below a splash dam S 23-¾ W 8-7/10 poles S 7 W 14-4/10 poles S 3¼ E 22-2/10 poles to a stake in the branch; thence down same S 23¾ E 14-3/10 poles, S 7½ E 20-1/10 poles to the beginning, containing 320 acres more or less."

In accordance with plaintiff's claim, her surveyor began at a point shown to him by her neighbors and kinsmen as the beginning point of the line. He describes it as being "at the foot of the hill just as the bank starts to slope up on the upper side of the path." The point is two feet from a buckeye tree and 80 feet northeasterly from the mouth of Twin Fork Creek. The surveyor ran his line up Big Fork as called for in the Mayo deed to a pine tree identified as the "corner to the lands of Mahala Fugate" called for in the deed. Reversing the calls for a test he, of course, arrived back at his beginning point. However, in going both ways the surveyor ignored the second and third calls, namely, "S 47 E 12 poles; N 73-¾ E 12 poles," and cut straight across the angles thus formed, the point being down close to the creek (thus forming the widest part of the strip claimed.) The court agreed with the plaintiff and her surveyor that since the pine tree at the Fugate corner was a definite and accepted monument, the proper way of locating the beginning of the line was by the reverse calls. The surveyor did not run the closing line of the description, as copied above, from "three forked spruce

pines below a splash dam.'' His reason was that there was no splash dam near that place and the pines were in a grove and none of them had been marked. This, of course, would have been the same kind of test to locate the beginning corner that was used for the first and south line. We are impressed with the fact that this surveyor was influenced a great deal, if he did not entirely rely, upon certain painted or otherwise marked trees along the line in question. This seems to be the reason why he ignored the two calls and cut straight across—because there was no marked tree along this line. None was called for. It was subsequently developed, first, by a son of the original grantor who had assisted in making the survey given in the Mayo deed, that after that was made some of these trees were marked; and, secondly, by another witness that the trees were marked again in 1934, when the company or its predecessor was having some surveying done for itself and difficulty was encountered in locating the line. This later survey was by the owner for its own use, and it is testified that exactness of this line was not then material.

There was some evidence that during the 43 years since the original survey was made there had been a shifting in the mouth of Twin Fork, although the distance as to the extent is very indefinite. We find no evidence of sufficient value to show that the mouth of the stream had moved as much as 80 feet. It may have shifted some, which would account perhaps for the failure to follow the calls in reverse from the tree at the Fugate corner to reach the present exact mouth. But where during a long period of time the thread of a stream constituting a boundary changes, the boundary changes with it. Spurrier v. Hodges, 90 S. W. 559, 28 Ky. Law Rep. 804. It is to be observed the original survey made no reference to a buckeye tree being two feet from the beginning point, as stated in plaintiff's present survey.

A recent survey for the defendant began just where the deed calls for, namely, ''at the mouth'' of the stream, then ran along substantially the meanders of Big Fork and came out at the pine tree at Fugate's corner. In some places it was a little above, in some places a little below, and in some places right in the stream.

The appellee attacks the survey and conclusion because the beginning point was "assumed," as a witness expressed it. The stake which may have been placed on the bank of the stream in 1903, of course, was gone. But there was no assumption in the sense of accepting it as a *theory* that the mouth of the creek was the beginning corner. The assumption that it was there is based upon the *fact* that the description placed it there very definitely. Designating a corner or the beginning of a survey of the boundary of lands at the mouth of a stream is an historical and familiar one. Thus, right here in Frankfort is the mouth of Benson's Creek. That was the designated corner for the juncture of the three Virginia counties of Lincoln, Fayette and Jefferson, making up the District of Kentucky before it became a state. It has been recognized and identified during 150 years or more. There is much more than this, however, to sustain the appellant. The description of the land is *"on"* the creek. The call from the starting point is "thence running *up* Big Fork." It is significant that the first courses do not call for any monument or object until a stake placed 12 feet from a buckeye (now gone) is reached. Then it goes to a rock, now present, close to the water's edge. The course then proceeds without a monument until spruce pines are reached near the Fugate corner—on the south or other side of the creek. There are 53 courses in the deed following this point, and everyone of them calls for a monument. On the closing or west line there is the same kind of description—courses without monuments after reaching the "three forked spruce pines below a splash dam" which point, obviously, was at or near the waters of Twin Fork. From there down Twin Fork there is no monument and a survey of the lines shows that they ran right along the side of the creek down to its mouth. As is well said in 8 Am. Jur., Boundaries. Sec. 29: "In surveying land adjacent to a stream, whether navigable or not, lines are often run from one point to another along or near the bank or margin of the stream in such a manner as to leave a quantity of land lying between these lines and the thread or bank of the stream. These are called meander lines, and they define the sinuosities of the stream which constitutes the boundary. They are the means of ascertaining the quantity of land subject to

sale and to be paid for by the purchaser. When a river has been so meandered in a survey, a grant in accordance with the survey ordinarily makes the water, and not the meander line, the boundary; and, in the absence of anything else in the language of the conveyance or the surrounding circumstances indicating a contrary intention on the part of the grantor, a deed or grant describing the boundary of the land granted as on or along the meander of the river will, as a general rule, convey title at least to the water line and will grant to the center of the stream and fix that as the boundary line if the grantor owned that far."

That is the well-settled law in Kentucky, that where a deed calls for the meanders of a stream as a boundary they must be followed and the courses and distances yield to the winding path of the stream where there is a conflict. Vaughn v. Foster, 47 S. W. 333, 20 Ky. Law Rep. 682; Stonestreet v. Jacobs, 118 Ky. 745, 82 S. W. 363; City of Hazard v. Eversole, 237 Ky. 242, 243, 35 S. W. 2d 313. In the old case of Cockrell v. McQuinn, 20 Ky. 61, 4 T. B. Mon. 61, the calls were to run from a corner on a river "down the river these several courses" (giving the courses but no corners) it was held that the river was the boundary line. This rule has been often confirmed. A review of the cases is given in Carter v. Elk Coal Co., 173 Ky. 378, 389, 191 S. W. 294, 298. While the word "meanders" is not used in this description, we do have the beginning at the mouth of a creek and the call "thence running up the Big Fork" on certain courses without monuments. When this description is laid out on the ground it substantially conforms to the meanders of the creek.

Evidence was introduced by the plaintiff, through persons who had assisted in the original survey, to the effect that the grantor, M. S. Napier, had then pointed out the lines he wished run to the surveyor and he ran them accordingly. They testified in substance that this irregular, narrow and substantially useless strip of land along the creek was not included or intended to be included in the description and conveyance. The court should have sustained the exceptions of the defendant to this testimony. It was incompetent to change or vary the writing. The question was not what Napier intended

to do but what he did do by his solemn act and deed. There was no latent ambiguity. Parol evidence is inadmissible in the absence of mistake or fraud to vary in any way a description of land which is complete and clear and the property conveyed in a deed is definite and unambiguous. Thus, where land is described by courses and distances, parol evidence is not admissible to prove that the true boundary is a line of marked trees not mentioned in the deed or that a deed stating a definite course was intended to express another, or to alter or vary the legal import of monuments, the location of which has been ascertained. 8 Am. Jur., Boundaries, sec. 94; 11 C. J. S., Boundaries, 105; Cissell v. Rapier, 3 Ky. Law Rep. 690, 11 Ky. Opin. 553. It is significant, however, that several of these witnesses testified that the survey began at the juncture of the two creeks—not 80 feet away, which testimony would appear to be competent as pointing out where a corner called for had been destroyed. Wallace v. Maxwell, 24 Ky. 447, 1 J. J. Marsh. 447.

We are of opinion that the judgment is erroneous and that the court should have located the line as contended for by the defendant and dismissed the petition.

Judgment reversed.